96 P.2d 293

**STATE v. GABALDON.**

No. 4464.

Supreme Court of New Mexico.

Nov. 21, 1939.

Fred Nicholas, of Albuquerque, for appellant.

Filo M. Sedillo, Atty. Gen., and A. M. Fernandez, Asst. Atty. Gen., for appellee.

BRICE, Justice.

The appellant, with Vidal Baca, was tried for the murder of Jose Gurule. Baca was acquitted and appellant convicted of the crime of manslaughter and sentenced to serve a term in the State penitentiary.

It is contended that the evidence does not legally establish that deceased was killed by appellant. This assignment calls for a review of the testimony.

■ We have held in numerous cases, both civil and criminal, that this court will review the testimony only to determine whether a finding, verdict, judgment, or decree is supported by substantial evidence; and if a search of the record discloses such support, we will not disturb the result.

The following facts are practically undisputed:

The deceased Jose Gurule and his brother Herminio Gurule, attended a dance at a house in or near the town of Belen, in Valencia County, New Mexico, on the night of the 11th of June, 1938. They left the dance about 1:30 o'clock in the morning of the 12th of June, and went upon the streets of the town of Belen. They had both been drinking, but were not intoxicated. They were seen by Vidal Baca, the town marshal, who ordered them to go home. This occurred a second time, resulting in an altercation. Baca fired his pistol in the air twice, left in his car and enlisted the appellant Gabaldon, a night watchman, Augustin Sedillo, and Juan Garcia, each a deputy sheriff, to aid in the arrest of the Gurule brothers, for whom they began a search. Sedillo and Garcia left the car first, to search behind a store, and Baca and the appellant drove about a hundred yards further, where they found the deceased and his brother sitting on the sidewalk. They got out of the automobile, and Baca, with a gun in his hand, notified them that they were under arrest. A fight ensued in which Baca struck Herminio on the head with his gun several times, while the appellant attempted to hold the deceased, who escaped and ran across the street. Baca had some difficulty in handling Herminio at first, and shot his gun in the air to attract the other officers. Following this gun shot, two other shots were fired south from the scene of the affray; at what distance the witnesses were unable to state. After Herminio was beaten until he was unconscious, the appellant and Baca put him in the car and started with him to the city jail. In the meantime, Sedillo and Garcia, having heard the shots, came from the north and met appellant and Baca, and the four took Herminio to the jail, which is in the city hall. Appellant left immediately but soon returned in his automobile and stated to Sedillo and

Garcia that he had found the deceased in an alley, wounded. The two deputies went with appellant to the side of the house of Mrs. Adelaida Baca, where they found the deceased, suffering from a gun shot wound and paralyzed from the waist down. The next day there was found in Mrs. Baca's back yard, about 45 feet from where the deceased's body was lying, a steel jacketed 45-caliber bullet, and, some 20 feet northwest of the body of the deceased, an empty 45-caliber shell. The wound was made by the bullet found, or one like it.

The clothing and flesh around the wound on deceased's body was powder burned, indicating that his slayer was within a very few feet of him when he was shot in the back. The bullet struck and shattered the fifth dorsal vertebra, lacerated the spinal cord, ranged upward and came out in the front of his neck.

The distance from the place of the affray to the corner of Mrs. Baca's house is 140 feet, and from said corner down an alley running at a right angle with the street, to the body of the deceased, is about 40 feet; a total of 180 feet.

The deceased stated that Baca shot him, but later when his mind apparently had cleared, he stated he did not know who shot him. Herminio could give no information because he had been beaten into insensibility by Baca.

The deceased was not shot by either Garcia or Sedillo, for they were still north of the place of the affray after the shots had been fired, and the shooting occurred in an alley south of that place.

There is no evidence to indicate any other person was near the place, or that another had the opportunity to shoot the deceased, or had cause to do so. We are satisfied that either the appellant or Baca shot him. The interests of the respective defendants, therefore, sharply conflicted.

The appellant told Sedillo and Garcia at the time he took them to the deceased in the alley, that he believed Baca had shot him. Later on the same day he signed a statement to the effect that Baca shot in the air during the scuffle and the deceased got loose from him and ran past the front of the car and, "I grabbed Herminio Gurule. Herminio and I then fell on the ground. I then saw Jose Gurule run across the street. Vidal Baca went towards the same direction after Jose Gurule and then I heard two shots. Herminio and I were scuffling on the ground." The only reasonable inference that could be drawn from this statement, if true, is that Baca shot the deceased.

At the trial of the case the defendants were not separately defended. All witnesses introduced were in the behalf of both. The appellant repudiated his statements that pointed to Baca as the one who killed the deceased. He stated:

"Vidal Baca, the marshal, fired up in the air, then Jose Gurule ran towards the south and turned behind the car. I jumped and grabbed Herminio, took him away from

Vidal. Then Vidal Baca directed himself to see where the other boy had run away. He crossed the highway.

"Q. Who crossed the highway? A. Jose Gurule, then Vidal Baca he was down on the ground with Herminio. I heard two more shots, then Vidal Baca helped me pick him up.

"Q. Then you told me (the district attorney) and in that statement you state, that you saw Vidal Baca follow Jose Gurule across the street, didn't you? A. Not that much.

"Q. Just how much did you say? A. Maybe one or two feet from me, that's all.

"Q. You also told me in my office, Mr. Galbadon, that Vidal Baca was the man who shot Jose Gurule, didn't you? A. No, Sir.

"Q. What did you tell me? A. I didn't know who shot him."

Appellant's statement regarding Baca was read to him and the following occurred:

"Q. Is that what happened? A. Not all that.

"Q. You signed this statement, didn't you? A. Yes.

"Q. Well, what happened, tell us, since you have changed your story? A. Vidal Baca didn't run after him, only just got away about two feet from me because at the same time, he helped me pick Herminio up from the ground.

"Q. And Vidal Baca only shot once into the air, is that right? A. Once in the air that I saw.

"Q. He wasn't the one who took the other two shots? A. I don't know, he could have been and he could have not been."

The defendant Baca had testified regarding his attempt to arrest Herminio and of striking him in the head with his gun, from the effect of which Herminio was dazed. Then he stated:

"At that time I heard two shots more, and it seemed to me that those shots were fired south of my car. At that time I saw Leopoldo; he was coming in this direction to aid me and I told him to help me along with that fellow. Then he grabbed that fellow by the arm and I took him by the other arm and I told Leopoldo where the other fellow went and he says, 'Pretty strong and got loose from me and just left.'

"Q. Now, you say that you shot again into the air right then, is that right? A. I did fire a shot in the air to signal the other officers.

"Q. Where was Leopoldo Gabaldon at this time? A. At that moment, I did not see him.

"Q. Was Jose Gurule standing near by? A. I did not see him.

"Q. Could you tell us whether or not he was standing by? A. I don't know, Leopoldo was wrestling with him near my car.

"Q. In your statement you stated you saw Jose Gurule cross the highway, is that right? A. I saw Jose Gurule crossing the highway.

"Q. Where was Leopoldo Gabaldon at that time? A. At that time Leopoldo came to help me to catch Herminio.

"Q. Where did he arrive from? A. Right next against my car.

"Q. Did he come out from behind the car or from in front of the car? A. He came out from in front of the car, near the fender of the car.

"Q. But you couldn't tell where he was coming from, is that right? A. He was coming from the direction of the back, south of my car.

"Q. And when you saw Leopoldo coming towards where you and Herminio were, you had already heard these two shots that you just testified to a while ago? A. Following my shot, I heard the two shots.

"Q. These two shots that you heard, did they seem as if they came from the direction, what direction, for instance? A. It sounded like from the south."

There is an innuendo in the statement of each of the defendants that the other may, or could have, shot the deceased without his knowledge; but each was careful to protect the other by testimony which, if literally true, would establish that neither of them shot him; because they were never separated from each other very far, and the slayer was about 180 feet from the place of the attempted arrest when that shot was fired.

The jury must have concluded that one of the two defendants killed the deceased and that this fact was known to both. We think the evidence justifies such conclusion. With this start towards a solution of the question, they determined that appellant was the guilty party from the following facts and inferences:

After Herminio was taken to the city hall, appellant left immediately, but soon returned with the information that he had found the deceased lying in an alley, wounded. His head was practically against the south side of Mrs. Baca's house, and could not have been seen from the place where the affray occurred, or without going south from there forty or fifty yards and then only by turning the lights of his car into the alley. The fact that appellant left so hurriedly from the city hall, together with his unsatisfactory statement regarding the finding of the wounded man, justified an inference that he knew that José had been shot and where he lay. His statement is as follows:

After leaving the city hall he stated that he went back to the store to resume his duties as night watchman, and made a round, and then discovered that he had lost a portion of his cap and went back to look for it.

"Q. Had you lost your cap, or what? A. Yes, Sir, when I got in the car I didn't have the top part on.

"Q. It is a part of the cap? A. Yes, Sir.

"Q. When you noticed that was gone, then what did you do? A. Then I said to myself that I had probably dropped it

where I had the scuffle and I went there and I found it.

"Q. That was in front of Castillo's, the place where this light pole was? A. Yes, Sir.

"Q. Go ahead. A. Then I found it and I got in the car again and went south.

"Q. You went down to the alley to turn or what was it? A. I turned on the highway and went north. When I was turning, by the light I could see somebody struggling on the ground here (Indicating point on plat where body was).

"Q. Just show where you were and where you saw this man? A. I was going north, turned right opposite the alley.

"Q. Where was that man, put your finger where the man was? A. It was right here in the alley, just saw him with my lights.

"Q. Now, that's the alley between the shoe shop and Adelaida Baca's house? A. Yes, Sir."

On cross-examination he testified:

"Q. Now Mr. Gabaldon, why was it that after you got in your car that you traveled over forty yards south before turning back? A. Because there was another car coming when I started my car.

"Q. Why didn't you just wait and let the car pass? A. Because I was already traveling and as soon as it passed I turned.

"Q. Then you said you turned your car right back here? A. I turned on highway 85, with the lights of the car I could see into the alley, somebody was moving in there.

"Q. Isn't it a fact, Mr. Gabaldon, that your conscience was hurting, that you knew that this man was shot and had been left out there to die in the alley and you couldn't stand it and you purposely went out there to find him? A. No, Sir."

It was about 3 A. M. and under ordinary circumstances, he would have turned his car where he stopped, or else have gone south to a street intersection. It is significant that he testified he turned the car at the only place where the lights could have revealed the body of the deceased; or at least his reason for not having turned directly around in the street casts doubt upon the truth of his statement. The inference that he knew the deceased was in the alley wounded, and wanted to aid him, is much more reasonable.

Thereafter, about 4:30 on the same morning, the defendant came back to the place where the difficulty occurred, where he was found and arrested by Sheriff Jaramillo. His excuse, or reason, for being there a second time was that he had lost some keys and was looking for them.

There is no evidence to indicate that Baca knew that deceased had been shot.

It may be inferred from the fact that appellant repudiated the statement in which he had in effect charged Baca with the crime, that such statement was false, and could have been made for but one pur-

pose; that is, to protect him, the slayer, by accusing an innocent man of the crime.

Baca had a 38-caliber pistol that night, which shot a "soft-nose" bullet. The deceased was shot with a 45-caliber automatic gun, carrying a steel-jacketed bullet. Appellant had carried such a gun in performing his duties as night watchman for a year or more previous to the shooting of deceased. He stated to Baca before the attempted arrest that he was prepared to protect himself against the "two dangerous men." At the trial he testified that he was not armed; that he possessed only a 25-caliber pistol, which he left in his automobile.

Regarding the 45-caliber automatic gun he was known to possess; he testified that he had owned such a gun about a year, but had sold it for $10 about two o'clock in the morning, four or five days before deceased was shot, to a truck driver who was a stranger to him, and whom he could not describe; nor could he describe the truck, further than that it was a large, old truck.

Regarding the bullets that his 45-caliber gun carried, he testified that he did not know much about bullets and could not say whether it shot steel-jacketed bullets, but he believed the one that was shown him (steel-jacketed) was like the one it carried. He then testified:

"Q. Did you ever see the bullets that this forty-five automatic held? A. Yes, Sir, I have seen them.

"Q. What kind of bullets were they? A. I don't know what is the name of the lead bullets.

"Q. They weren't steel-jacketed bullets did you say? A. I don't believe so, I don't know.

"Q. How come you told Officer Ehret that your gun carried steel-jacketed bullets? A. I don't remember if I did tell him so."

He had previously stated to Officer Ehret that his gun carried steel-jacketed bullets. Officer Ehret testified:

"Q. Just what did he tell you, what kind of a bullet? A. We tried to determine what type of bullet was used in Mr. Gabaldon's automatic. At that time I had the same type cartridge that I have here in my belt, soft-nosed, the lead is not covered at all and the other Officer had what we call the lubaloy.

"Q. Is that the steel-jacketed? A. No, Sir, it is a soft-nosed bullet. We had Mr. Gabaldon examine those cartridges and he said the kind that he used is not either one, that is, the ones that we had; but said it was covered, a covered lead and covered with a steel jacket.

"Q. That is what he told you? A. Yes, Sir.

"Q. Is that the type of bullet that he meant? A. That is the type of bullet; he says that he used, steel-jacketed."

When appellant returned to the city hall the morning the shooting occurred, he stat-

ed to Garcia and Sedillo, "Come on, I have found the other boy in the alley on the ground, and I believe he is dead." On the way to the deceased appellant said: "I don't know whether Vidal Baca fired a shot into him or not, but I believe he did. I don't know whether he is dead or alive." There was apparently no doubt in his mind regarding the identity of the person in the alley, nor that he had been shot. But he testified at the trial that he saw someone struggling in the alley; that he never got out of his car but returned immediately to the city hall, "and I told them there was a man on the ground in the alley. I didn't know whether he was drunk, or was the one Vidal Baca was looking for." This indicates that he was in doubt about the man's identity and suggests he might have been drunk, not that he was dead or wounded. But he expressed no doubt the night of the shooting.

It was appellant, and not Baca, who was wrestling with deceased, and it was from appellant that deceased escaped before he ran across the street. It is much more probable that the appellant followed deceased, than that Baca (who at the time was busy beating Herminio's head with his 38-caliber gun) followed and shot him. We are reluctant to believe that Baca would have surrendered his victim until completely subdued, as from his testimony this seems to have been his mode of reasoning with recalcitrant prisoners.

 The circumstances and reasonable inferences indicate that deceased was shot with a 45-caliber, steel-jacketed bullet; that appellant only, among the officers taking part in that night's affair, possessed a gun that carried such bullet; that he was struggling with deceased and deceased escaped from him just before the shot was fired that killed him; that he alone knew that deceased lay wounded in the alley. These facts and inferences together with his attempt to charge Baca with the crime (which he himself repudiated at the trial), and his unreasonable stories regarding the sale of his pistol and the manner of his finding the deceased in the alley; all indicate, and are substantial evidence, that appellant was guilty of the crime.

 It is asserted that the appellant as an arresting officer was entitled to overcome deceased's resistance by all means necessary to effect his arrest, citing State v. Vargas, 42 N.M. 1, 74 P.2d 62, 65; but the rule there stated had reference to the right of an officer to resist a deadly attack made upon him. The facts in that case do not apply here, or there is no evidence of it. It is stated in that case:

"There is no question but that large rocks hurled by a man the size of this misdemeanant were dangerous weapons. Section 540, Wharton's Criminal Law (12th Ed.) vol. 1, p. 776, is as follows: 'Officer when in danger of life may kill person charged with misdemeanor attempting to escape. Although an officer must not kill for an escape where the party is in custody for a misdemeanor, yet if the party assault the officer with such violence that he has reasonable ground for believing his life

to be in peril, he may justify killing the party.'"

The testimony shows that the deceased had fled from the scene of the conflict; that some person caught him in the alley where another struggle occurred; that he was then shot in the back and there is no evidence to show, or indication that this was necessary to effect his arrest.

"An officer charged with the duty of arresting a misdemeanant has no more au-, thority to shoot him down to prevent an escape than he would have the right to kill any indifferent person who was casually walking or running away from the place where the officer happened to be; and of course, a private person who was lending aid in effecting the arrest at the request of the officer, as was the defendant here, according to one aspect of the evidence, would certainly have no more right than the officer himself." Handley v. State, 96 Ala. 48, 11 So. 322, 38 Am.St.Rep. 81.

The same rule applies if a misdemeanant is under arrest and breaks away and flees. The officer is not authorized to shoot or kill him merely to stop the flight. Thomas v. Kinkead, 55 Ark. 502, 18 S.W. 854, 15 L.R.A. 558, 29 Am.St.Rep. 68; Brown v. Weaver et al., 76 Miss. 7, 23 So. 388, 42 L. R.A. 423, 71 Am.St.Rep. 512.

█ It is asserted that the trial court erred in overruling appellant's motion for an instructed verdict at the close of the State's case. We are not called upon to decide the question. If the court erred in that regard the error was waived by the appellant upon his election to introduce defensive testimony. State v. Turney, 41 N. M. 150, 65 P.2d 869, and cases cited therein.

█ It is contended by appellant that as the State in its case in chief introduced his admissions regarding his ownership, shortly prior to the shooting of deceased, of a 45-caliber pistol, that his exculpatory statement introduced as a part of it, to the effect that he had sold the pistol three or four days before deceased was shot, is binding on the State; and if binding, the evidence will not support a conviction. The specific question was not raised in the district court. If it has merit, it could have been saved by an appropriate requested instruction. Otts v. State, 135 Tex.Cr. R. 28, 116 S.W.2d 1084, 116 A.L.R. 1454.

We do not find that State v. Hernandez, 36 N.M. 35, 7 P.2d 930, and State v. Clements, 31 N.M. 620, 249 P. 1003, decide this question. It was stated in State v. Butler, 38 N.M. 453, 34 P.2d 1100, 1101, citing the above two cases: "We have held that the state, having introduced an incriminating admission, is bound to overcome the exculpatory matter contained in it. * * * In this case the statement was sufficient evidence of the homicide. Its character, as justifiable or not, was a question for the jury." But we need not go into the merits of this question. The defendant testified to substantially the same story regarding the sale of the pistol as that made to the witness Ehret, except in much greater detail. His exculpatory testimony in court was then before the jury on his own volition, and its truth or falsity

was a proper subject of their inquiry. This question has been before the Court of Criminal Appeals of the State of Texas many times. In Otts v. State, supra [135 Tex.Cr.R. 28, 116 S.W.2d 1087, 116 A.L. R. 1454], that court has reconciled its decisions and held in substance that the rule does not apply to the statement of a defendant in a criminal prosecution, who testifies in his own behalf:

"One exception to the rule which should cause no confusion is where the defendant testifies and his testimony corresponds to the exculpatory statements put in evidence by the State, and the defensive issue arising from his testimony is fairly submitted to the jury. The reasons which obviate the necessity for charging on exculpatory declarations under such circumstances are clearly set forth in Yarbrough v. State, 125 Tex.Cr.R. 304, 67 S.W.2d 612."

The defensive issues arising from appellant's testimony were submitted to the jury, in part, through instructions prepared by him. He made no objections to any instruction, and they fairly presented his defense. Under the circumstances of this case the weight to be given his exculpatory statement was for the jury.

■ The following question was asked the defendant Baca:

"Now, this statement that Leopoldo Gabaldon here made wherein he states, 'That he saw Jose Gurule crossing the street on Highway 85 and that he saw you going towards the direction of Jose Gurule,' is that statement true or not?"

The objection was "It does not lie in this witness now to prove the falsity of other witnesses' statements, and whether some other witness is telling the truth or not." The objection is not very plain, but probably it was intended to be upon the ground that a witness could not be asked if a statement made by another witness was true or false. The court overruled the objection and Baca answered "No."

The question was improper but we believe the error was harmless. If he had been asked "Did you follow Jose Gurule across the street when you saw him go?" and he had answered "No" the question would have been proper and the effect would have been the same. We think the error was harmless.

Other questions are raised but are without merit and those decided are determinative of all the issues.

The judgment of the district court is affirmed.

It is so ordered.

BICKLEY, C. J., and ZINN, SADLER, and MABRY, JJ., concur.