This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:   March 5, 2015**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                            **NO. 33,845**

**DONALD FERRAN,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
Sheri A. Raphaelson, District Judge

The Scarborough Law Firm
Juan Carlos Scarborough
Albuquerque, NM

Tony Scarborough
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Chief Justice.**

{1}     This is a capital appeal from Defendant's two convictions for first degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994), and single conviction for tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003). Defendant raises seven arguments on appeal: (1) judicial and prosecutorial misconduct during trial deprived him of his right to a fair trial; (2) his right to confront one of the State's witnesses against him was violated, depriving him of a fair trial; the trial court erred in qualifying one of the State's witnesses as an expert; (4) the trial court erred in admitting hearsay testimony over Defendant's objection; (5) the trial court erred in denying Defendant's motion for a directed verdict; (6) the State's evidence was insufficient to support Defendant's convictions; and (7) cumulative errors deprived Defendant of his right to a fair trial. For the reasons that follow, we affirm Defendant's convictions. We dispose of Defendant's appeal by this non-precedential decision because settled New Mexico law resolves the issues raised. *See* Rule 12-405(B)(1) NMRA.

**I.      BACKGROUND**

{2}     Defendant was convicted of two counts of first degree murder for the February

28, 2011, killings of Joey Maestas (Maestas) and Sara Salazar (Salazar) in Rio Arriba County. He was also convicted of tampering with evidence for the destruction by fire of the vehicle in which the bodies were found. The jury convicted Defendant based largely on circumstantial evidence showing that Defendant killed Maestas and Salazar at a rest stop and then set Maestas' car ablaze with the two bodies inside of it. A summary of the evidence presented at trial is set out below; additional facts and procedural background are provided as needed throughout our discussion of the individual issues.

{3}      Defendant was a habitual drug user, and on February 27, 2011, he contacted Maestas, who sold drugs and had previously provided cocaine to Defendant. That evening, Defendant went to Maestas' house, where Maestas, Salazar, and two of Maestas' friends were present. Defendant was known to carry a .22 caliber pistol and was seen carrying a gun that night. Defendant left Maestas' house after a period, but later, sometime between 12:00 and 2:00 a.m., Defendant again called Maestas, telling him that he was at a rest area and needed assistance because he had run out of gas. Maestas agreed to go to the rest area to help Defendant. Maestas left his home, accompanied by Salazar, and picked up Defendant. The three of them returned to Maestas' home, retrieved a gas can, and departed again around 2:00 a.m. Maestas was

last heard from at approximately 2:36 a.m., when he called another individual and stated that he, Salazar, and Defendant were near the rest stop.

{4} Approximately one hour later, at 3:35 a.m., police and firefighters were dispatched in response to a vehicle fire at the rest stop. The vehicle, Maestas' 2000 Honda Accord, was completely engulfed in flames. While firefighters were fighting the blaze, someone noticed the victims' bodies inside the burning vehicle. The body of one of the victims, later identified as Maestas, was found laying face down across the back seat with a gunshot wound to the head. Forensic evidence established that he died from the gunshot wound prior to the fire being started and that the bullet was a .22 caliber bullet. Salazar was found in the driver's seat, but it was impossible to tell whether she had also been shot because of the fire damage to her body, which was so severe that the top portion of her head was gone. Expert testimony concerning Salazar's autopsy revealed that she was already dead or dying before the fire, and her death was determined to have been caused by "homicidal violence of unknown cause." The fire investigator later testified that his conclusion was that the fire was "incendiary," that is, deliberately started.

{5} Sometime after the fire was put out, the hood of Maestas' vehicle was opened and police and firefighters noticed that the battery was missing. There was no

evidence that the battery had melted or was otherwise burned up in the fire. Since Maestas had been able to drive his car to the rest stop that night and there was no evidence that the battery was destroyed in the fire, investigators concluded that it had been removed while the car was at the rest stop. Investigators later retrieved a car battery from the front seat of Defendant's Jeep. A second battery, which did not fit properly, was found under the hood of his Jeep. This second battery, a red and black "Duralast" branded car battery, was the type commonly manufactured to fit a 2000 Honda Accord, the same make and model as Maestas' vehicle that was burned. Evidence showed that sometime prior to February 27, Defendant had traded a red and black "Duralast" branded car battery to Maestas for cocaine.

{6} Further investigation of Maestas' burned vehicle revealed that the vehicle's gas cap was missing. Testimony presented at trial was inconclusive as to what might have happened to the cap, but two gas caps matching the size and type used on a Honda Accord were discovered in Defendant's Jeep.

{7} The police also recovered a .22 caliber bullet casing from the center console of the burned vehicle , and ballistics evidence established that the bullet was fired from the .22 caliber pistol Defendant was known to carry. Brian Nelson, a friend of Defendant's, testified that Defendant regularly shot the .22 caliber pistol at Nelson's

5

house and that Defendant was the only person to shoot a .22 caliber there. Police recovered a .22 caliber casing from Nelson's house , as well as a .22 caliber casing from Defendant's Jeep. Ballistics evidence confirmed that the casings found in the burned vehicle, at Nelson's house, and in Defendant's Jeep were all fired from the same .22 caliber pistol, but the police never recovered that .22 caliber pistol. Nelson testified that Defendant told him that he had gotten rid of his .22 after the murders.

{8}      Finally, evidence was presented which suggested that Defendant instructed his mother to lie and tell police that he had returned home around midnight. Defendant's mother testified that she heard Defendant's Jeep arrive home between 12:00 a.m. and 1:00 a.m. However, she did not hear Defendant come inside the house. Phone records showed that Defendant's mother called him after 4:30 a.m. Defendant's mother testified that she called to ask where he was, after realizing he was not home. On the afternoon of the 28th, Defendant sent a text message to his mother stating "I[ ]got home at 12 last nite [sic]." She replied with confirmation that she had told the police that he had been home, but that she did not give them a time because she did not know what time he had arrived. She testified that she did not actually see Defendant arrive home until sometime between 5:00 a.m. and 6:00 a.m.

## II.    DISCUSSION

6

**A. Alleged Judicial and Prosecutorial Misconduct Did Not Deprive Defendant of a Fair Trial**

{9} Defendant argues that judicial and prosecutorial misconduct deprived him of a fair trial. Defendant did not preserve this argument below, and thus concedes that the applicable standard of review is fundamental error. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]")."Even if the defendant did not raise proper objections at trial, he may be entitled to relief if the errors of which he complains on appeal constituted . . . fundamental error." *State v. Lucero*, 1993-NMSC-064, ¶ 12, 116 N.M. 450, 863 P.2d 1071 (internal quotation marks and citation omitted); *see also* Rule 12-216(B) ("This rule shall not preclude the appellate court from considering . . . in its discretion, questions involving: . . . fundamental error or fundamental rights of a party."). "The doctrine of fundamental error is to be resorted to in criminal cases only for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to permit the conviction to stand." *Lucero*, 1993-NMSC-064, ¶12 (internal quotation marks and citation omitted). "In determining whether a judge has exceeded the bounds of acceptable conduct, the proceedings must be viewed as a whole. The critical inquiry is whether the trial judge's behavior was so prejudicial that it denied [the appellants]

7

a fair, as opposed to a perfect[,] trial." *State v. McDonald*, 1998-NMSC-034, ¶ 16, 126 N.M. 44, 966 P.2d 752 (alterations in original) (internal quotation marks and citations omitted).

{10} Defendant argues that alleged misconduct resulted in an unfair trial and ineffective assistance of counsel. Defendant points to discussions on certain evidentiary rulings at trial as the basis for his claim of judicial misconduct. First, Defendant alleges that the trial judge inappropriately chastised defense counsel for his cross-examination of New Mexico State Police Investigations Agent Eric Moya, and challenged defense counsel's personal integrity in front of the jury. However, Defendant fails to acknowledge that the first of these conversations actually happened during a bench conference, and the second took place after the jury was excused. Defendant cites to another instance during which he claims the trial judge "loudly and verbally criticize[d] and upbraid[ed] defense counsel," "out loud in earshot of the jury." Again, this particular exchange occurred during a bench conference. Defendant also asserts that the trial judge displayed improper body language toward defense counsel. The State points out that the trial judge's body language is not part of the transcript and is not supported by the record. Defendant argues that these instances demonstrated the trial judge's bias against Defendant and his counsel and prejudiced

the jury against Defendant.

{11}     Defendant cites *Bufford v. Rowan Companies, Inc.*, 994 F.2d 155, 158 (5th Cir. 1993) for the proposition that "[t]he court must take great care not to . . . give the impression to the jury that it approves or condones any unjustified impugning of the ethical standards or integrity of an officer of the court practicing before it." In *Bufford*, the Fifth Circuit held that the conduct of defense counsel and the trial judge denied the plaintiffs a fair trial. *Id.* at 157. There, defense counsel alleged in his opening statement that plaintiffs' counsel had fabricated or exaggerated the plaintiffs' injuries. *Id.* at 157. The defense had no evidence of such allegations. *Id.* at 158. In addition, the trial judge later threatened to jail plaintiffs' counsel for a retort he made in response to the judge's evidentiary ruling. *Id.* at 158-59. The judge's threat was heard by the jury. *Id.* at 159. *Bufford* is not factually analogous to the present case. Here, unlike in *Bufford*, the prosecutor did not accuse defense counsel of unethical behavior in front of the jury. In addition, although the trial judge in this case did chastise defense counsel for repeatedly attempting to pursue questions which the judge had already prohibited, there is no evidence that such admonitions were inappropriate, nor that the jurors heard any of these exchanges.

{12}     Defendant also cites *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980)

9

in support of his claim of judicial misconduct. The *McDonald* Court found that the fairness of the trial against the defendant was compromised where the prosecutor suggested during a direct examination that defense counsel was present while the defendant destroyed incriminating evidence. *Id*. at 562, 564. Defendant's reliance on *McDonald* is misplaced. Here, Defendant points to no evidence that either the prosecutor or the court falsely accused defense counsel of any wrongdoing, or that the jury heard such an accusation.

{13}     We find the reasoning in *Harris v. United States*, 367 F.2d 633 (1st Cir. 1966) applicable here. The *Harris* Court held that where "the alleged disparaging remarks complained of were made during bench conferences with counsel and there is no showing that they were heard by the jury[,] . . . we cannot say that these remarks prejudiced the defendant's case or amounted to a denial of a fair trial as he claims." *Id*. at 636. Likewise here, because Defendant cannot demonstrate that any allegedly disparaging remarks were heard by the jury, we cannot find that he was prejudiced by such remarks.

{14}     Defendant refers to alleged prosecutorial misconduct, but fails to develop any argument or cite any specific examples of such misconduct. Therefore, we do not review this claim. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764,

676 P.2d 1329 ("Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal.").

**B.     Defendant's Confrontation Rights Were Not Violated During Cross-Examination of Agent Moya**

{15}     Defendant argues that the trial court limited his counsel's ability to cross-examine one of the State's witnesses, thereby depriving him of his constitutional right to confront this witness. Defense counsel attempted to elicit testimony from Agent Moya, the State Police agent who lead the investigation in this case, concerning a man named George Roybal. Defense counsel asserted that, according to a search warrant affidavit prepared by Agent Moya, Roybal allegedly told Moya or another state police officer that Maestas tried to obtain a gun from him for protection. Apparently Defendant's alternative theory of the case is that there was bad blood between Maestas and another drug dealer named Zachary Pacheco, that Pacheco had previously tried to harm Maestas, and that Maestas sought the weapon from Roybal to protect himself from future harm by Pacheco. The inference to be drawn from this alternative theory appears to be that it was Pacheco that was responsible for the murders and not Defendant.

{16}     The State objected to defense counsel's inquiry on cross-examination of Agent Moya, asserting that any inquiry about Roybal would be hearsay and would

11

improperly put irrelevant information before the jury. Defense counsel stated that his intended questioning would not concern the content of Agent Moya's conversation with Roybal, but instead would address Agent Moya's decision not to add Roybal to a list of people whose phone numbers were included in a search warrant as part of the investigation. The trial court voiced concerns that defense counsel was attempting to embed facts in his inquiry of Agent Moya that had no proper foundation, were inadmissible hearsay, and which no other evidence would establish were relevant to the case. The trial court ruled that defense counsel could ask why Roybal was not included on the list, but could not ask about any statement made by Roybal about Maestas looking for a gun or about any incident between Pacheco and Maestas. Defense counsel attempted to make a proffer of the evidentiary basis for his questioning, but the trial court determined that he would be allowed to ask his proposed question, and therefore the issue was solved and no proffer was necessary. Defendant now argues that the trial court's ruling improperly limited his ability to effectively cross-examine Agent Moya and violated his confrontation rights.

{17}     "[W]e review de novo the question of whether the Confrontation Clause has been violated." *State v. Smith*, 2001-NMSC-004, ¶ 19, 130 N.M. 117, 19 P.3d 254. The trial court has "wide latitude insofar as the Confrontation Clause is concerned to

12

impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* (omission in original) (internal quotation marks and citation omitted). "Only when cross-examination is unduly restricted does constitutional error result." *Id.*

{18} The trial court did not unduly restrict defense counsel's ability to cross-examine Agent Moya in this case. In fact, it does not appear that the trial court limited defense counsel's questioning at all. Defense counsel told the trial court that he planned to ask why Roybal's phone number was not included in the search warrant, and the trial court ruled that he was allowed to do so. However, the trial court maintained concern that defense counsel would attempt to ask Agent Moya about the conversation with Roybal, despite the fact that nothing was presented on direct testimony concerning such a conversation and no other evidence established that the conversation would be relevant. The trial court's advisement not to ask about the conversation did not limit the scope of defense counsel's questioning because defense counsel assured the trial court that he did not intend to do so anyway.

{19} Further, as the State points out, even if defense counsel had expressed an intention to go into this line of questioning, any out-of-court statements made by

Roybal would have been inadmissible on hearsay grounds. *See* Rule 11-801(C) NMRA (defining "hearsay" as a statement made outside the court proceeding and offered in court to prove the truth of the matter asserted); Rule 11-802 NMRA (providing that hearsay is inadmissible unless it falls within an exception in the rules or statutes). Roybal's statements to Agent Moya were made outside of trial and, in order to support Defendant's theory, would have been offered for their truth–that Maestas had in fact approached Roybal about obtaining a weapon to protect himself from Pacheco.

{20} We also point out that defense counsel failed to include Roybal as a defense witness so that he could be directly questioned about his knowledge of any bad blood between Pacheco and Maestas. Given that Defendant's theory of the case seemed to rest on the presence of such bad blood, it is unclear why he did not call the one person believed to have first-hand knowledge of the dispute. Regardless, Defendant fails to demonstrate that the trial court improperly limited his ability to cross-examine Agent Moya, and therefore we find no violation of his confrontation rights.

**C.     Fire Marshal Dan Wright's Expert Testimony Was Properly Admitted**

{21} Defendant argues that Deputy Fire Marshal Dan Wright was not qualified as an expert witness and should not have been allowed to testify. Defendant appears to

14

intertwine two separate arguments in relation to Wright's testimony. First, Defendant argues that Wright was not qualified to testify as an expert in fire investigation based on training, education, or experience. Second, Defendant argues that Wright's testimony was based on theories and methods not commonly accepted by the relevant scientific community. Each of these arguments is addressed in turn.

{22} "The rule in this State has consistently been that the admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion." *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192. "The trial judge has wide discretion to determine whether a witness is qualified to give testimony as an expert, and no set criteria can be laid down to test [an expert's] qualifications." *McDonald*, 1998-NMSC-034, ¶ 19 (alteration in original) (internal quotation marks and citations omitted).

{23} Defendant argues that "Wright was incompetent and not qualified by reason of education, training or experience to give a *Daubert* scientific opinion about anything," citing *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). "Under Rule 11-702 NMRA, a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible." *State v. Torrez*,

2009-NMSC-029, ¶ 15, 146 N.M. 331, 210 P.3d 228 (internal quotation marks and citation omitted); *see also* Rule 11-702 NMRA ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."). In his brief, Defendant relies on a selective presentation of Wright's testimony about his training and experience as support for his claim that Wright was unqualified, but fails to articulate any argument that those pieces of Wright's testimony demonstrate that Wright was not qualified to testify as an expert.

{24} The State called Wright, who testified that he was currently employed by the Fire Investigation Bureau of the State Fire Marshal's Office, and that he had worked there for a total of eight or nine years. Wright testified that he had been a volunteer firefighter for about twenty-eight years, and had also been employed as a car mechanic during those years. Wright stated that he began working at the State Fire Marshal's Office as an investigator, and eventually worked his way up to Chief Investigator. He testified that in order to become a fire investigator, he was required to work for one year under probation, during which he always worked with another investigator, and he was also required to have worked on at least fifty fires before he

could work alone. Additionally, Wright attended a two-week course in fire investigation at the National Fire Academy. Wright also had experience as a Fire Service Instructor, teaching others to investigate fires.

{25} After Wright testified extensively about his usual investigation methods and his investigation of this particular scene, the State moved his admission as an expert in fire investigation. Defendant objected to his admission as an expert. The trial court held a bench conference, during which Defendant argued that "[Wright] doesn't have the education, training, or experience to express expert opinions in this subject matter of causation of a fire. . . . He's incompetent to give a *Daubert* scientific opinion about anything. . . . [H]e's . . . barely qualified to render a lay opinion." The trial court ruled, over Defendant's objection, that Wright would be allowed to testify as an expert on fire investigation based on his training and experience.

{26} This Court has "emphasized the use of the disjunctive 'or' in Rule 11-702 in recognizing the wide discretion given the trial court in qualifying experts to testify." *Torrez*, 2009-NMSC-029, ¶ 15; *see also* Rule 11-702 (providing that experts may be qualified by "knowledge, skill, experience, training, *or* education" if their "scientific, technical, *or* other specialized knowledge" will assist the fact-finder (emphasis added)). In *Torrez*, the defendant claimed that a police detective, who was admitted

to testify as an expert in gang-related law enforcement, was not properly qualified to offer expert testimony. 2009-NMSC-029, ¶ 16. The defendant based his argument on various factors, including that the detective:

(1) did not have personal knowledge of Taos area gangs; (2) did not have a college degree; (3) had not previously testified as an expert before a jury; (4) had never worked undercover in a gang unit; (5) had not published any materials that were subject to peer review; and (6) could not point to any recognized field of study that sought to determine why gang members assault one another.

*Id*. The record reflected that the detective possessed several qualifications, including years of experience, his various certifications, and the fact that he had authored various training manuals in his field. *Id*. ¶ 17. This Court found that "Rule 11-702 expressly allows experts to be qualified based on their skills and experience, and [the detective's] experience with gangs was sufficient to allow his testimony on this subject." *Id*. ¶ 18. This Court held that "[b]ased on these qualifications, we cannot say that the trial court abused its discretion in qualifying [the detective] as an expert on gang-related law enforcement and gang culture." *Id.*

{27}     *Torrez* supports the State's argument that Wright was qualified to testify as an expert in fire investigation in this case. Wright's qualifications as an expert based on training and experience are similar to the qualifications of the detective's in *Torrez*: several years of experience, various training courses, and experience as a trainer of

18

other fire investigators. *See id.* ¶ 17. Further, as this Court noted in *Torrez*, "the jury was free to weigh every aspect of [the detective's] qualifications in their evaluation of his testimony, and any perceived deficiencies in his qualifications were relevant to the weight accorded by the jury to [the] testimony and not to the testimony's admissibility." *Id*. ¶ 18 (second alteration in original) (internal quotation marks and citation omitted). For the same reasons we found that the detective in *Torrez* was properly admitted as an expert, we conclude that Wright was properly admitted as an expert in this case. Any potential deficiencies in his qualifications were relevant to the weight to be afforded to his testimony, not to its admissibility.

{28}    Second, Defendant argues that Wright's testimony was not based on reliable scientific methods. Defendant takes issue with various techniques Wright used in his investigation, arguing that "Wright's testimony, statements, and opinions lack scientific and evidentiary validity and reliability." The State correctly notes that although Defendant said the word "*Daubert*" during his objection at trial to Wright's admission as an expert, Defendant did not object to any of Wright's testimony about his investigation. At no point during Wright's testimony about the investigation did Defendant object to the reliability of his methods. In fact, the only objection Defendant made, other than objecting generally to Wright's admission as an expert,

was to the use of a picture of a car battery that had been in a fire in another, unrelated case, and that objection was sustained. The State argues that because Defendant failed to object to Wright's testimony about his investigation techniques, Defendant failed to preserve the issue for appeal.

{29} "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." Rule 12-216(A). "[I]t is a fundamental rule of appellate practice and procedure that an appellate court will consider only such questions as were raised in the lower court." *State v. Gomez*, 1997-NMSC-006, ¶ 14, 122 N.M. 777, 932 P.2d 1 (internal quotation marks and citation omitted). If the opposing party fails to timely object to or move "to strike the expert testimony in question, the issue is not preserved for appellate review." *State v. Foster*, 1999-NMSC-007, ¶ 43, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶¶ 31-35, 142 N.M. 120, 164 P.3d 1. Defendant does not argue that the issues he raises concerning the reliability of Wright's testimony under *Daubert* amount to fundamental error such that they may be reviewed. Accordingly, Defendant failed to preserve his *Daubert* claims for review.

{30} Nonetheless, we discuss Defendant's claim that Wright's testimony was unreliable. Defendant seems to "confuse[] the standards applicable to determining the

20

admissibility of expert *scientific* testimony with those for admitting expert testimony based on the *specialized knowledge* of the expert witness." *Torrez*, 2009-NMSC-029, ¶ 20. New Mexico courts "limit[] the requirements of *Daubert/Alberico* to testimony that requires scientific knowledge [and hold] that application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 19, 134 N.M. 421, 77 P.3d 1014 (internal quotation marks and citations omitted). Defendant lists the *Daubert* factors used to evaluate the evidentiary reliability of scientific testimony, but fails to note that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." *State v. Torres*, 1999-NMSC-010, ¶ 43, 127 N.M. 20, 976 P.2d 20 (internal quotation marks and citation omitted).

{31} "[T]he initial determination of whether to apply the *Alberico-Daubert* standard entails a conclusion of law that is subject to de novo review." *Torres*, 1999-NMSC-010, ¶ 28. Since we have determined that Wright's testimony was based on his training and experience, and not on scientific knowledge, the *Alberico-Daubert* standard is not applicable. "[W]hen testing the reliability of non-scientific expert testimony, rather than testing an expert's scientific methodology as required under

*Daubert* and *Alberico*, the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *Torrez*, 2009-NMSC-029, ¶ 21. "[E]ven with non-scientific expert testimony, the trial court must exercise its gate-keeping function and ensure that the expert's testimony is reliable." *Id*. ¶ 21. "We review the trial court's admission of expert testimony for an abuse of discretion." *Id*. ¶ 9.

{32} Defendant does not provide any argument explaining why Wright's testimony is unreliable under the test for a non-scientific expert's opinion testimony. "While this inquiry is similar to a determination of whether an expert is qualified to opine on a given subject, the two inquiries are not identical." *Id*. ¶ 22. In order to present non-scientific opinion testimony, the expert must have sufficient knowledge and experience to form a reliable opinion, and the testimony must prove what it purports to prove. *Id.* ¶¶ 22-23. Based on Wright's experience as a fire investigator and trainer with the State Fire Marshal's Office, the trial court did not abuse its discretion in admitting his testimony about fire investigation for purposes of proving the cause of the fire.

**D.    The Trial Court Did Not Err by Admitting Out-of-Court Statements of State Witnesses**

{33} Defendant argues that the trial court erred by admitting the testimony of two

witnesses, which Defendant argues was impermissible hearsay. First, Defendant argues that the trial court erred by allowing Marcos Valdez (Valdez) to testify that Maestas received a phone call from Defendant about being out of gas and requesting Maestas' assistance. Valdez testified that he was awoken by the sound of Maestas' voice on the night, or during the early morning, of the murders. Valdez stated that he heard Maestas talking on the phone, then heard Maestas tell Valdez's brother, Andres Baca (Baca), that Defendant had called Maestas and told him he was out of gas. Valdez testified that Maestas said he could not "leave [Defendant] shafted like that" and that Maestas asked Baca if he wanted to go with him to pick up Defendant. Defendant argues that these out-of-court statements were offered to prove that Maestas received a call from Defendant about being out of gas and needing Maestas' assistance. The trial court admitted the testimony as a present sense impression exception to the rule requiring the exclusion of hearsay testimony.

{34}     Defendant also argues that the trial court improperly admitted hearsay testimony of Jose Lovato (Lovato). Lovato testified that Maestas called Lovato and told him that Maestas had received a call from Defendant about being out of gas. Lovato also testified that Maestas asked him to accompany Maestas in assisting Defendant because Maestas said he did not trust Defendant. Defense counsel objected

to the introduction of Lovato's testimony, but the trial court overruled Defendant's objection, finding that it was not hearsay because it was not being offered to prove the truth of the matter asserted, namely that Defendant had run out of gas. The State also argued that Lovato's testimony was admissible because it qualified under the present sense impression exception to the rule against hearsay, but the trial court ruled that the testimony was "not even hearsay." On appeal, Defendant does not argue that the testimony was hearsay nor does he articulate why the trial court's ruling was legally erroneous. Instead, Defendant argues that Lovato's testimony should not have been admitted because it was "nothing more than unsubstantiated narrative" and "inherently untrustworthy."

{35} "We review the admission of evidence for an abuse of discretion" and note that "trial courts have broad latitude in exercising their discretion under this rule." *State v. Chavez*, 2008-NMCA-125, ¶ 9, 144 N.M. 849, 192 P.3d 1226. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). Hearsay is an out-of-court statement offered

into "evidence to prove the truth of the matter asserted in the statement." Rule 11-801(C). Hearsay is generally inadmissible, unless it falls within an exception prescribed in the rules of evidence. Rule 11-802. Rule 11-803(1) NMRA provides that the following is excepted from the rule against hearsay, regardless of whether the declarant is available as a witness: "Present sense impression. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."

{36} The trial court did not abuse its discretion in admitting Valdez's testimony. The trial court correctly ruled that Maestas' out-of-court statements included in Valdez's testimony qualified as present sense impressions because they explained the event, the phone call from Defendant about being out of gas, while, or immediately after, Maestas received the call. Further, "[a]lthough independent corroboration is not a foundational requirement for admission, it may be a factor in the trial judge's exercise of discretion in admitting the hearsay." *Flores*, 2010-NMSC-002, ¶ 54. Here, the trial court had other evidence with which to support its admission of Valdez's statements. First, Defendant actually admitted during his first interview with police that he had called Maestas, claiming that he had run out of gas, though Defendant told the officer that he made the phone call as a favor to Maestas, who supposedly wanted an excuse

to leave with Salazar. Additionally, Baca's direct testimony that Defendant returned with Maestas and Salazar to retrieve a gas can corroborated statements indicating that Maestas responded to Defendant's call for assistance, and therefore supported the trial court's finding that the testimony was admissible as a valid present sense impression.

{37} With respect to Lovato's testimony, the trial court did not abuse its discretion in ruling that it was not hearsay because it was not offered to prove that Defendant actually did run out of gas. Whether or not he actually did run out of gas was irrelevant, as the trial court found, and in fact, Defendant told police himself that the gas ploy was a ruse all along.

**E.      Defendant's Motion for a Directed Verdict was Properly Denied**

{38} At the close of the State's case-in-chief, defense counsel moved for a directed verdict, which the trial court denied. The trial court found that the State had presented sufficient evidence to go to the jury on all of the counts for which Defendant was eventually convicted. After the State rested, Defendant proceeded to present evidence in his defense. On appeal, Defendant argues that the trial court erred in denying his motion for directed verdict because there was insufficient evidence to support the underlying charges.

26

{39} "It is well-settled that a defendant who presents evidence waives his claim that the evidence at the close of the State's case was insufficient for submission to the jury." *State v. Baldwin*, 2001-NMCA-063, ¶ 30, 130 N.M. 705, 30 P.3d 394 (internal quotation marks and citation omitted); *see also State v. Gabaldon*, 1939-NMSC-060, ¶ 9, 43 N.M. 525, 96 P.2d 293 ("If the court erred in [overruling appellant's motion for an directed verdict at the close of the State's case] the error was waived by the appellant upon his election to introduce defensive testimony."). Therefore, even if the trial court had erred in denying Defendant's motion for a directed verdict, his presentation of a defense constitutes a waiver of the right to raise this error on appeal.

**F.      Sufficient Evidence Supports Defendant's Convictions**

{40}      Defendant also argues on appeal that there was insufficient evidence to support his convictions. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Flores*, 2010-NMSC-002, ¶ 2 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "In reviewing whether there was

sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted).

{41} Resolving all disputed facts in favor of the State, there was substantial evidence supporting a finding of guilt beyond a reasonable doubt for both of Defendant's convictions for first degree murder, as well as his conviction for tampering with evidence. First, there were several pieces of evidence tying Defendant to the scene of the crimes. Most notably, Defendant was the last person seen with Maestas and Salazar, after he called Maestas and asked him to come to the rest stop. Additionally, Maestas was shot with a .22 caliber bullet; .22 caliber bullet casings were found in the burned vehicle, in Defendant's Jeep, and at Nelson's house (where Defendant was known to have fired a .22 caliber pistol); and ballistics evidence indicated that all the casings were fired from the same pistol. Also, the battery was missing from Maestas' car, nothing indicated it was consumed by the fire, and a battery designed for use in a 2000 Honda Accord was found in Defendant's Jeep after the murders. Finally, the gas cap from Maestas' car was missing, while a gas cap fitting the type commonly used on a 2000 Honda Accord was found in Defendant's Jeep.

{42} Additional evidence provides further support for Defendant's convictions for first degree murder. "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). "'Deliberate intention' is defined as, 'arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action.'" *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (quoting UJI 14-201 NMRA). Based upon the evidence presented at trial, a reasonable juror could conclude that Defendant committed the murders with deliberate intent. The victims were found in the same remote location where Defendant had asked Maestas to meet him, shortly after Defendant called Maestas for assistance, and Defendant admitted to police his story about running out of gas was a ruse. Considering these facts, along with the circumstances detailed above, a reasonable juror could conclude that Defendant fabricated the excuse that he had run out of gas as a ploy to lure Maestas to the rest area, supporting a finding of deliberation and premeditation. The intentional destruction of the vehicle with the bodies inside of it evidences culpability, as does the evidence showing that, shortly after the killings occurred, Defendant got rid of the gun he often carried.

{43}     Further, sufficient evidence supports Defendant's conviction for tampering with evidence. "Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5 (A). Evidence at trial showed that significant physical evidence at the scene was destroyed by the fire. Reasonable minds could find that the fire was intentionally started, based on the testimony of the fire investigator; the fact that the battery was missing, ruling out the possibility that the fire was caused by an accidental electrical malfunction; and the fact that there were two murder victims' bodies inside the car. Further, evidence established that a gunshot wound caused Maestas' death, and Salazar's cause of death was "homicidal violence." Although both victims' bodies were severely damaged by the fire, experts were able to determine that these thermal injuries were sustained after death, indicating that neither victim started the fire. A reasonable juror could conclude that the fact that both victims had been killed or were near death before the fire shows that the fire was started to prevent apprehension, prosecution, or conviction for murder. There was certainly sufficient evidence presented at trial upon which reasonable minds could support a conclusion of guilt.

**G. Cumulative Error**

{44} Finally, Defendant argues that the cumulative impact of the trial court's allegedly erroneous rulings amount to cumulative error, depriving him of a fair trial. Defendant argues that his claims of judicial misconduct and erroneous evidentiary rulings, in sum, amount to cumulative error.

{45} "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Salas*, 2010-NMSC-028, ¶ 39, 148 N.M. 313, 236 P.3d 32 (internal quotation marks and citation omitted). "In New Mexico the doctrine of cumulative error is strictly applied. It cannot be invoked when the record as a whole demonstrates that the defendant received a fair trial." *Id*. (internal quotation marks and citation omitted). There is no claim for cumulative error where no error exists. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (holding that "[w]here there is no error to accumulate, there can be no cumulative error"). While Defendant repeats his previous arguments about judicial misconduct and evidentiary rulings, based on the foregoing we are not persuaded that any error occurred, nor that Defendant was deprived of a fair trial.

**IV. CONCLUSION**

{46} Based on the foregoing, we affirm Defendant's convictions.

{47} **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**